IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **GARY ANTHONY RANDAZZO,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil No. 10-733-DRH-CJP** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT and RECOMMENDATION

**PROUD, Magistrate Judge:**

This Report and Recommendation is respectfully submitted to Chief Judge David R. Herndon pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Gary Anthony Randazzo seeks judicial review of the final agency decision finding that he is not disabled and denying him Disability Insurance Benefits (DIB) pursuant to **42 U.S.C. § 423**.

## Procedural History

Mr. Randazzo's application for DIB was denied initially and on reconsideration. After an evidentiary hearing, Administrative Law Judge (ALJ) David R. Wurm denied the application for benefits in a decision dated December 9, 2009. (Tr. 10-15). Plaintiff's request for review was denied by the Appeals Council, and the December 9, 2009, decision became the final agency decision. (Tr. 1).

Plaintiff has exhausted his administrative remedies and has filed a timely complaint.

## **Issue Raised by Plaintiff**

Plaintiff was represented by counsel in the administrative proceedings, but is pro se in this Court. Plaintiff claims that he is disabled due to back problems, high blood pressure, acid reflux, sleeping problems and arthritis. (Tr. 140). He argues that the ALJ's decision was not supported by substantial evidence because:

1. The ALJ's analysis of the Listings was flawed in that the ALJ incorrectly said that he had not been diagnosed with lumbar spinal stenosis resulting in pseudoclaudication.

2. The ALJ did not "fully explain" his limits of mobility and dexterity.

3. The vocational expert did not address the requirements of his past work as he actually performed it.

4. The ALJ did not consider his age, education, lack of other experience in the work force or his inability to secure employment.

## **The Evidentiary Record**

As an initial matter, the Court notes that, in his brief, plaintiff describes additional medical and surgical treatment which occurred long after the ALJ rendered his decision. In view of the scope of judicial review, however, this Court cannot consider evidence that was not before the ALJ. ***Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994)**.

The Court has reviewed and considered the entire administrative record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record.

### **1. Disability Reports**

In the initial Disability Report, dated November 14, 2007, Mr. Randazzo indicated that he was born in 1951. He alleged that he became disabled as of August 20, 2007. (Tr. 136-138).

In a subsequent report, plaintiff stated that he was 5'11" tall and weighed 230 pounds. He said that was unable to work due to severe back pain. He had been employed as a creel clerk. In that job, he rode in a boat and interviewed fishermen. He estimated that he sat for 6 hours, walked for 1 hour and stood for 2 hours in that job. The heaviest weight lifted was 5 pounds. (Tr. 139-141).

Mr. Randazzo also submitted a Work History Report in which explained that his job as a creel clerk involved interviewing fishermen, measuring fish and recording data. He did this from a boat and from shore. He estimated that he sat for 4 hours a day, with 3 hours of walking and 3 hours of standing. He also said that the heaviest weight lifted was 100 pounds or more, and that he frequently lifted 50 pounds or more. (Tr. 146-147).

**2. Medical Treatment**

K. Murugappan, M.D., was plaintiff's family doctor. The transcript contains records beginning in 2001. (Tr. 205). In addition to routine care, Mr. Randazzo was treated for low back pain with Vicodin. On June 19, 2007, he complained of back pain, and the doctor noted that he had been on Vicodin for a long time and needed to be evaluated. (Tr. 216).

Dr. Murugappan referred Mr. Randazzo to Dr. Paul Juergens at Southern Illinois Pain Management for evaluation and treatment of his back pain. Plaintiff was first seen in Dr. Juergens' office on July 25, 2007. The office visits were generally with a physician's assistant. On the first visit, plaintiff gave a history of neck and back pain for 10 years. He complained of numbness in his left thigh, with aching and burning in both buttocks. He also had aching in both legs, both shoulders, neck and back. He claimed to have ruptured the disc at L4-L5 in 1983. Thereafter, he had an injection, but no surgery. (Tr. 182). On physical examination, his lumbar

range of motion was normal, but with pain. His cervical range of motion was decreased. He had full muscle strength and normal gait. Straight leg testing was "normal with local back pain at 90 degrees bilateral." Because he felt that his cervical symptoms were equal to his lumbar symptoms, MRI testing of the cervical and lumbar spine was recommended. (Tr. 184).

On August 7, 2007, a PA in Dr. Juergens' office reviewed the MRI results with Mr. Randazzo. The cervical MRI showed areas of disc and osteophyte complex, greatest at C5-6. The lumbar MRI showed early spinal stenosis at L4-5 with narrowing of the neural foramina and central portion of spinal canal, and L3-4 bulge with narrowing of neural foramina. (Tr. 186).

Dr. Richard George of Southern Illinois Pain Management performed a lumbar epidural steroid injection on August 21, 2007. (Tr. 188). About a week later, plaintiff reported to Dr. George that he had no relief of his low back or leg pain. Dr. George recommended a diagnostic medial block. (Tr. 189). The medial block was administered by Dr. Juergens on September 10, 2007. (Tr. 191). At the follow-up visit, plaintiff told the physician's assistant that he had some immediate relief, but the pain was back. He also complained that his pain medication, Lyrica, was making him sleepy. She recommended another diagnostic block. (Tr. 193-194).

A second diagnostic block was done on October 9, 2007. (Tr. 195). He again had temporary relief, and was scheduled for a facet neurotomy. (Tr. 197). Dr. Juergens performed a radiofrequency facet neurotomy[1] at L4-L5 and L5-S1 on the left on October 24, 2007. (Tr. 199).

---

[1]According to the website of the Mayo Clinic, this is a procedure which "uses heat generated by radio waves to damage specific nerves and temporarily interfere with their ability to transmit pain signals." http://www.mayoclinic.com/health/radiofrequency-neurotomy/MY00947 (accessed on May 10, 2011).

At the follow-up visit, Mr. Randazzo felt he had achieved a 60% reduction in his pain. He was scheduled to have the procedure done on the right side at the same levels. (Tr. 200). The second stage of the procedure was done on November 15, 2007. (Tr. 202). In a follow-up visit on December 6, 2007, plaintiff indicated that he had relief of 50% of his pain and that he was doing "fairly well." The physician's assistant recommended physical therapy. (Tr. 203-204).

On December 21, 2007, Mr. Randazzo went to the emergency room complaining of back pain which had started in physical therapy a few days earlier. He was given medication and released. (Tr. 289).

In January, 2008, during a visit with a PA at Dr. Juergens' office, plaintiff stated that the facet neurotomy had decreased his pain, but had not resolved it. On exam, his lumbar range of motion was full. He had full muscle strength and normal straight leg raising. The PA prescribed Neurontin and an epidural steroid injection, which was done on March 12, 2008. (Tr. 278, 277).

Dr. Juergens examined plaintiff on November 13, 2008. Plaintiff complained of back and neck pain. On exam, he had decreased range of motion of the neck with tenderness. Dr. Juergens diagnosed cerviobrachial syndrome and neck pain, and ordered a cervical MRI. (Tr. 275). The MRI findings were similar to the findings on the previous test in July, 2007. (Tr, 273-274). Dr. Juergens performed diagnostic facet block and medial branch blocks in the cervical area in December, 2008, and January, 2009. (Tr. 270, 267). He had an essentially normal physical exam on February 4, 2009. (Tr. 265).

Mr. Randazzo went to the emergency room for back pain on June 12, 2009. He had muscle spasms and limited range of motion. (Tr. 286-287). On June 23, 2009, he was seen by a physician's assistant in Dr. Juergens' office for increasing pain in his low back and legs. He had

a full range of motion, but had pain. He had tenderness in the lumbar paraspinal region. The straight leg raising test was normal. The assessment was low back pain, lumbar degenerative disc disease, lumbar disc herniation (displacement, bulge, protrusion), lumbar spinal stenosis and muscle spasm. The recommendation was to repeat the facet neurotomy at L4-5 and L5-S1. (Tr. 263-264). Dr. Juergens did this procedure on the left on June 29, 2009, and on the right on July 13, 2009. (Tr. 261-262).

In the follow-up visit on August 6, 2009, plaintiff reported that he had 50% pain relief and he rated his pain as a 3. On physical examination, his lumbar range of motion was normal, with pain. Muscle tone and bulk were normal. No muscle spasms were noted. Muscle strength was 5/5. Straight leg testing was normal bilaterally. Dr. Juergens' office ordered physical therapy and a functional capacity assessment. (Tr. 259-260).

Mr. Randazzo attended the initial physical therapy session on August 24, 2009. The evaluation was that he would benefit from a strengthening program as he had trunk weakness. He was referred to Novacare Rehabilitation Services in Benton, Illinois, for a functional capacity evaluation. (Tr. 283). On September 18, 2009, it was noted that Mr. Randazzo did not return for any of his scheduled appointments following the initial evaluation. He was discharged due to non-compliance. (Tr. 284). There is no indication that the functional capacity evaluation ever took place.

**3. State Agency Physician RFC Assessment**

A non-examining state agency physician reviewed records and completed a RFC assessment form on January 4, 2008. He noted that plaintiff has lumbar degenerative disc disease with pain and a body mass index of 33. He also noted that plaintiff was able to ambulate

unassisted and his muscle strength was 5/5. Dr. Pilapil concluded that Mr. Randazzo was able to lift 20 pounds occasionally and 10 pounds frequently, stand/walk for 6 out of 8 hours, sit for 6 out of 8 hours, and had no limitations of ability to push/pull. These are the exertional requirements of light work, per 20 C.F.R. §404.1567(b). He assessed no postural, manipulative, visual, communicative or environmental limitations. (Tr. 232-239).

A second state agency physician affirmed the above evaluation on March 17, 2008. (Tr. 256-258).

**4. Plaintiff's Testimony**

Plaintiff was represented at the hearing by an attorney. (Tr. 21).

Mr. Randazzo has a 12th grade education. (Tr. 22). He worked for 16 years as a creel clerk. He conducted surveys of lakes for various state agencies. This involved interviewing fishermen, measuring fish, and entering data on reports. He was in a boat most of the time. He sometimes had to lift an outboard motor weighing 200 pounds. (Tr. 23).

Plaintiff testified that he has pain in his back and down his legs, along with stiffness and pain in his shoulders and neck. He has had steroid injections and neurotomies, but, as of the time of the hearing, no surgery such as fusion or laminectomy. He has pain on a level of 6 or 7, and it gets worse. He takes Tramadol and Vicodin. He takes Vicodin every 4 to 6 hours, which "masks the pain a little bit." (Tr. 24-25).

His sleep is interrupted by pain. He is not comfortable going up and down steps. He can take a shower by himself. His wife has to help him put on socks, shoes, and, sometimes, pants. His wife does most of the driving because the instructions on his medications say not to drive. His wife works nights, so she is home during the day to help him. She does most of the cooking

and all of the dishes and laundry. He is unable to mow the lawn due to pain. (Tr. 25-28).

His medications cause him drowsiness and dizziness. (Tr. 30-31).

Mr. Randazzo testified that he can only walk 50-60 feet. He can sit for only a few minutes, and then he has to shift position to relieve his pain. He can stand only for few minutes. He can lift a gallon of milk, which he estimates to weigh 8 pounds. (Tr. 29-30).

**5. Vocational Expert**

Billy Brown testified as a vocational expert (VE). His resume is at Tr. 111. Plaintiff did not voice any objection to his qualifications.

The VE testified that the *Dictionary of Occupational Titles* classifies the job of creel clerk as light and unskilled. However, as Mr. Randazzo performed it, the exertional requirements were from light to heavy, based on his statement that he was required to lift heavy outboard motors and gas cans. (Tr. 33-36).

The ALJ asked the VE to assume a person who could do light work, but was limited to only occasional stooping, crouching and crawling with no complex tasks. The VE testified that such a person would be able to perform the job of creel clerk as it is classified by the DOT, but not as the job had been performed by Mr. Randazzo. (Tr. 37). The addition of a sit/stand option and a limitation to only occasional overhead reaching would not alter the ability to do the job as the DOT classifies it. (Tr. 38).

## Applicable Standards

In the Social Security context, a claimant is “disabled” when he has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **See, *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992); *Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the Commissioner finds that the claimant has an impairment which is severe and he is not capable of performing his past relevant work, the burden shifts to the Commissioner to show that there are a significant number of jobs in the economy that claimant is capable of performing. **See, *Bowen v. Yuckert*, 482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).**

The scope of this Court's review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).** The task for this Court is not to determine whether plaintiff is, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence; and, of course, whether any

errors of law were made. **See, *Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).** In so doing, this Court uses the Supreme Court's definition of substantial evidence, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).**

In reviewing for substantial evidence, the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).** Further, in analyzing the ALJ's decision for "fatal gaps or contradictions," the Court "give[s] the opinion a commonsensical reading rather than nitpicking at it." ***Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999)**.

**Analysis**

The ALJ properly followed the five-step analysis. He determined that plaintiff was not working and that he has severe impairments of degenerative disc disease, obesity and hypertension. He concluded that plaintiff's impairments do not meet or equal the requirements of Listing 1.04, Disorders of the Spine. He noted that plaintiff has a body mass index of 35, but concluded that his obesity did not cause him to meet or equal a Listing. He concluded that his hypertension did not cause him to meet or equal a Listing. The ALJ concluded that he has the RFC to do light work, limited to only occasional stooping, crouching and crawling, with a sit/stand option and no complex tasks. The ALJ noted that this evaluation was more restrictive than the state agency physician's assessment. Based on the testimony of the VE, ALJ Wurm found that plaintiff is capable of performing his past relevant work of creel clerk as it is

generally performed. (Tr. 10-15).

The ALJ concluded that plaintiff is not disabled because he can do his past relevant work as it is generally performed. A claimant who can do his past relevant work as it is generally performed in the national economy is not disabled, even if he cannot perform his exact old job. **SSR 82-61**; ***Halsell v. Astrue*, 2009 WL 4913322, *6 (7th Cir. 2009)**.

Mr. Randazzo's first point is that the ALJ erred in stating that he did not have spinal stenosis resulting in pseudoclaudication. This issue is relevant to whether plaintiff met the requirements of a listed impairment. Mr. Randazzo argues that Dr. Juergens diagnosed this condition. He does not cite to a specific place in the transcript for this argument.

It is true that Dr. Juergens diagnosed spinal stenosis. He did not, however, make an explicit diagnosis of the presence of pseudoclaudication.[2] The ALJ acknowledged that a lumbar MRI showed spinal stenosis. See, Tr. 14.

The ALJ discussed pseudoclaudication in analyzing whether plaintiff's impairments meet or equal Listing 1.04C, which requires lumbar spinal stenosis resulting in pseudoclaudication "manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b." Dr. Juergens did not document weakness in the legs or inability to ambulate effectively. In fact, as the ALJ noted, Dr. Juergens' office notes repeatedly documented full muscle strength and a normal gait. The medical evidence therefore indicates that plaintiff's condition did not meet or equal Listing 1.04C, and the ALJ did not err in so concluding.

---

[2]Pseudoclaudication is "pain and discomfort in the buttocks, thighs, legs and feet with walking or prolonged standing" which results from narrowing of the lumbar spinal canal. http://www.mayoclinic.com/health/pseudoclaudication/HQ01278 (accessed on May 10, 2011).

For his second point, plaintiff argues that the "limit of mobility and dexterity was not fully explained to the extent of the disability." He asserts that he is unable to stoop, crouch, bend, walk any distance without stopping to rest, or carry anything over 8 pounds. Doc. 16, p. 3. It is somewhat unclear what plaintiff is arguing here. He cites 20 C.F.R. 404.1525 and 404.1526(b) in support. These sections relate to the determination of whether impairments meet or equal a listed impairment. Presumably, Mr. Randazzo believes that he meets Listing 1.04C. However, for the reasons discussed above, he does not.

The Court notes that, in connection with his argument about Listing 1.04C, Mr. Randazzo points out that he had laminectomy surgery in December, 2010. See, Doc. 16, p. 3. However, the issue in this proceeding is whether the ALJ's decision was supported by substantial evidence. Obviously, evidence of medical treatment which occurred after the ALJ's decision cannot be considered by this Court.

It may be that plaintiff is arguing that the ALJ erred in assessing his credibility. The ALJ clearly considered plaintiff's allegations about his limitations. See, Tr. 13-14. The ALJ was not bound to accept plaintiff's testimony. The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. ***Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).** The ALJ did not reject all of plaintiff's testimony, since he included postural limitations in the RFC assessment. Plaintiff has not demonstrated any error with regard to the credibility findings. As the ALJ's credibility findings were not "patently wrong," they should not be overturned. ***Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.2000).**

Mr. Randazzo takes issue with the VE's testimony regarding the actual requirements of the job of creel clerk as he performed it. He sets forth additional information about the job in his

brief. To the extent that this information was not before the ALJ, it cannot be considered by this Court. In any event, since the ALJ found that Mr. Randazzo is unable to perform the functions of the job as it was previously performed by him, additional details about how he performed the job are not relevant.

The VE testified, and the ALJ found, that plaintiff could perform the functions of creel clerk as that job is generally performed. The *Dictionary of Occupational Titles* says that a creel clerk does the following:

> Interviews anglers and inspects catch to compile statistical data concerning recreational fishing; Greets anglers returning from recreational fishing and solicits permission to examine catch. Counts and examines fish to ascertain total caught and to identify species and sex. Collects deformed or diseased fish for analysis by others. Measures and weighs fish, using ruler and scale. Interviews anglers to determine state of residence, method and locations of fishing, and type of bait used. Records data obtained and tabulates results.

*DOT*, § 205.367-026.

According to the VE's testimony, the DOT classifies the job of creel clerk as light and unskilled. The VE testified that a person with plaintiff's RFC could do the job as it is generally performed. Plaintiff has not offered anything to refute that testimony. Where the VE's testimony is reliable and does not conflict with the DOT, his testimony constitutes substantial evidence. See, ***Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008)**, and cases discussed therein.

Lastly, Mr. Randazzo argues that the ALJ erred because he did not consider his age, education, lack of other experience or inability to find work. However, 20 C.F.R. §404.1520(f) and (g) direct the ALJ to consider the vocational factors of age, education and work experience only where the claimant is unable to perform his past relevant work. Because Mr. Randazzo can

perform his past relevant work as it is generally performed, the ALJ was correct in not considering other vocational factors. And, the inability to find work does not qualify a claimant for disability benefits. 20 C.F.R. §1566(c).

In sum, none of plaintiff's points are well-taken. Further, in view of plaintiff's pro se status, this Court has undertaken a general review of the record, and concludes that the ALJ's decision is supported by substantial evidence and that no errors of law were made.

**Recommendation**

This Court recommends that the final decision of the Commissioner of Social Security, finding that plaintiff Gary Anthony Randazzo is not disabled, be **AFFIRMED.**

Objections to this Report and Recommendation must be filed on or before **May 31, 2011.**

**Submitted: May 11, 2011.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**